SHELTON COLLEGE, APPELLANT, v.
STATE BOARD OF EDUCATION, RESPONDENT.

Argued October 24, 1966—Decided February 6, 1967.

503

504

*Mr. David W. Conrad* argued the cause for appellant (*Mr. Griffith H. Jones,* of counsel; *Messrs. Conrad & Jones,* attorneys).

*Mr. Joseph A. Hoffman,* Assistant Attorney General, argued the cause for respondent (*Mr. Alan B. Handler,* First Assistant Attorney General, of counsel; *Mrs. Marilyn Loftus Schauer,* Deputy Attorney General, of counsel and on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by
WEINTRAUB, C. J. Shelton College (herein Shelton) attacks the constitutionality of our statute relating to the granting of baccalaureate degrees. The vehicle for this attack is an appeal to the Appellate Division from so much of a resolution of the State Board of Education "as purports to limit the duration of the authority of Appellant to confer the degree of Bachelor of Arts to September 15, 1966," which date was extended by further resolution to June 30, 1967. We certified the appeal before argument in the Appellate Division.

The record consists only of the notice of appeal and the resolutions already mentioned. The first resolution, dated December 13, 1965, recites the following: that on June 2,

1965 the State Board of Education resolved not to grant approval to Shelton of its practice of conferring degrees; that a hearing begun on July 21, 1965 was interrupted by legal action initiated by Shelton with the result that the school year 1965–66 got under way; that upon request Shelton submitted a statement of its current condition; that a further investigation revealed compliance with some of the standards which theretofore had not been met; that a question continues as to compliance with other standards described in the resolution; but nonetheless in the interest of the students then enrolled and in the light of the problems attendant upon a disruption of the college in mid-year, approval was given of the practice of conferring the degree of bachelor of arts, such approval to continue to September 15, 1966. As we have already noted, the State Board of Education adopted a further resolution (dated June 27, 1966) which, after reciting a later annual evaluation of the college and the Board's finding that certain specified standards had not yet been met, nonetheless concludes the authority to bestow the degree of bachelor of arts should be extended until June 30, 1967 upon, however, 12 stated conditions to be met by Shelton not later than May 1, 1967.

The record is no more revealing than the foregoing recital of it. Nevertheless Shelton seeks by way of an appeal from a portion of the first resolution to have us strike down a statute designed to control the granting of the bachelor degree. Shelton adduced no proof to support the constitutional attack. Nor did the State offer proof in that regard, perhaps because the grounds of attack were first stated in the brief the College filed on this appeal to the Appellate Division. In these circumstances we should apply liberally the presumption in favor of constitutionality and the supporting doctrine that where constitutionality depends upon the factual setting, the courts should assume sufficient facts do exist if it is at all reasonable to indulge in such an assumption.

Before turning to the specific challenges, we will summarize the statute and its history.

Prior to 1889 the power to confer degrees had been granted expressly in special acts of incorporation. In that year a statute (*c*. 116), now *N. J. S. A.* 18:20–2, was adopted empowering any college founded under a general act of our Legislature to confer degrees other than a degree authorizing the practice of medicine, dentistry, or law.

In 1912 the Legislature adopted *c*. 315, entitled "An Act to prescribe the terms and conditions under which degrees may be conferred by any school or institution of learning within this State." That statute prohibited the conferring of a degree "until the terms and conditions of such degree * * * shall first be submitted to and approved of by the State Board of Education," with the proviso that the statute shall not apply to a school "established and conducted within this State for a period of twenty-five years prior to the passage of this act." This 25-year exemption excluded from the statute's ambit colleges formed prior to the adoption of the 1889 act already referred to, and thus excluded (as we will point out later in discussing Shelton's claim that the statute denies equal protection of the law) those institutions which had received the power to confer degrees under special acts of incorporation.

In 1916 the Legislature adopted *c*. 152, entitled "An Act to prohibit the conferring by any school * * * of degrees based upon proficiency or learning, without the approval of the State Board of Education * * *." This act superseded the 1912 act just referred to, the bill containing this express parenthetic note: "(In place of Chapter 315, P. L. 1912; P. L. 1912, pp. 554, 555)." Section 2 of the 1916 statute rephrased the substance of the 1912 statute, including the 25-year exemption. In addition to thus continuing the 1912 requirement for "approval" of the basis for the conferring of degrees, the 1916 statute innovated in section one the further requirement of a "license" for all institutions which confer degrees, without any exemption. We note also, for later reference, the fact that section 8 of the 1916 statute expressly stated that "If any provision of this act shall be held to be

unconstitutional or invalid, such unconstitutional or invalid provision shall be considered severable from the remainder of this act, and shall be exscinded therefrom.

. The "license" provision of the 1916 statute now appears in *N. J. S. A.* 18:20–5:

"No corporation shall furnish instruction or learning in the arts, sciences, or professions for the purpose of admitting any person to the grade of a degree, or shall confer or participate in conferring a degree, giving to any person a diploma of graduation or of proficiency in a course of study, proficiency in learning, or scientific arts or methods, within this state, until it shall have filed a certified copy of its certificate of incorporation with the state board of education, and obtained from such state board a license to carry on the business under such rules and regulations as the state board may prescribe."

*N. J. S. A.* 18:20–6 authorizes a suit by the Attorney General to restrain an unlicensed operator, and *N. J. S. A.* 18:20–7 provides that a license may be revoked by the State Board of Education.

The degree "approval" provision of the 1912 and 1916 statutes now appears in *N. J. S. A.* 18:20–8 and reads:

"No school, corporation, association or institution of learning conducted within this state, nor any officer or member thereof, in recognition of the attainment or proficiency of any person in pursuing or graduating from any course or courses of study, arts, or learning conducted by it or another such school, corporation, association or institution, shall admit any such person to the grade of a degree by conferring, or participating in conferring, any degree upon any person without first submitting the basis or conditions thereof to the state board of education, and obtaining its approval thereof, and of the practice of conferring and bestowing such degrees.

Nothing contained in this section shall apply to any school, corporation, association or institution of learning, or officer or member thereof, which was established and conducted within this state on March seventeenth, one thousand eight hundred and ninety-one, and was then in the course of admitting persons to the grade of a degree by conferring the same upon them in recognition of their attainments or proficiencies, nor to any school conducted under the public school system."

We note that in the *Revised Statutes* the revisers, in using the year 1891 in the exempting provision, calculated the 25-

year period from 1916 rather than 1912, upon which circumstance we will comment later. *N. J. S. A.* 18:20–9 provides for the revocation of the "approval" given under *N. J. S. A.* 18:20–8.

Other sections impose penalties for violations of the licensure and "approval" provisions. See *N. J. S. A.* 18:20–10 and 11.

In sum, then, Shelton challenges the constitutionality of a statute (1) which requires all degree-conferring colleges to obtain a license and (2) which requires approval of the basis and conditions for conferring a degree except as to institutions within the 25-year exemption.

## I

■ First Shelton says it is beyond the power of government to regulate in any way the award of the bachelor degree, and this because of the right of free speech guaranteed in *Art.* I, ¶ VI of the State Constitution and the First Amendment to the United States Constitution.

It should be noted that the resolution in question does not limit in any way what Shelton may teach. Rather the resolution concerns the power to confer the bachelor degree. Hence Shelton's thesis, logically extended, must be that everyone has the absolute power to bestow degrees evidencing higher educational achievement, no matter how remote the course of instruction may be from the values the educational degree is commonly thought to hold. It contends that society may protect itself from the obvious evils of that proposition only by relying upon private evaluations of colleges, such as those made by the regional accreditation associations which now pass upon the standing of colleges on a voluntary basis.

Shelton points to no authority to support its position. The history of the subject runs strongly the other way. The public interest in higher education has been evident since medieval times. *Selden, Accreditation: A Struggle over Standards*

*in Higher Education* (1960), *pp.* 8–9.[1] Today in most coun-tries ministries of education control educational standards. *Selden, op. cit., supra,* at *p.* 12; *Accreditation in Higher Education* (U. S. Dept. of Health, Education, and Welfare 1959), *p.* 3; *Reid, American Degree Mills* (1959), *p.* 19. The story in the United States has been uniquely different, for here, overall, government has played a modest role. The result has been a chaotic scene with which private interests have had to contend on a wholly cooperative basis. There emerged a sys-tem of regional associations which continue to set standards and accredit institutions. For the history and description of this program, see the references just cited and also Kaplin and Hunter, "The Legal Status of the Educational Accredit-ing Agency: Problems in Judicial Supervision and Govern-mental Regulation," 52 *Cornell L. Q.* 104 (1966).

Whatever the reason for the modest governmental activity in this area, it was not for doubt as to the power of the States to act. In *Trustees of Dartmouth College v. Woodward,* 4

---

[1] The interest of the Church and State in medieval seats of learning is there described in these terms:

"At first these centers of study existed without external authority, but in time princes and popes granted charters, officially creating *studia generalia* and extending to masters and students special privileges including exemption from taxation, from military service, and from trial in courts of civil magistrates; in time, many other privileges were granted. Since most students were not native to the location of a particular university and therefore would not have sufficient protection in a local civil court, the exemption from juris-diction of the civil courts was particularly important as an induce-ment to attract students. For an institution to obtain important and adequate recognition outside of its own domain, a grant by papal bull or royal order was required—as the *ius ubique docendi,* the right to teach anywhere, was dependent on such a grant, and was essential to the tutor who wished to be accepted in a guild of masters.

Not only was it important for the universities to have papal or royal support, but it also was important for both church and lay authorities to seek the allegiance of the universities, since these two groups sparred with each other for political supremacy. Conse-quently, popes vied with kings in granting privileges to the univer-sities, which thus were able to maintain a degree of relative au-tonomy throughout the struggle for their control, which continued

*Wheat.* 518, 634, 4 *L. Ed.* 629, 658 (1819), in which the charter of incorporation was held to be a contract the State could not undo, Chief Justice Marshall said, in axiomatic style:

"That education is an object of national concern, and a proper object of legislation, all admit."

And it is the degree, evidential as it is of academic attainment, which especially is an appropriate object of regulation. As stated in *Elliott, The Colleges and the Courts* (1936), *p.* 200, "The power to confer academic degrees is to be regarded as distinct and separate from the privilege of being incorporated as an educational institution. The privilege of granting degrees is very intimately related to the public welfare, and is unquestionably subject to regulation by the State."

Thus the Supreme Court of Vermont refused to imply the power to confer degrees, saying in *Townshend v. Gray,* 62 *Vt.* 373, 19 *A.* 635, 636, 8 *A. L. R.* 112 (1890):

for several centuries. And, it should be remembered, this was at a time when scholars were taking a leading part in shaping the ideas of the Church and when the Church held undisputed domination over western thought and culture."

*Angell and Ames, Private Corporations* (8th ed. 1866) says, at *p.* 37:
"Corporations for the advancement of learning, however (or what *we* denominate colleges), were entirely unknown to the ancients, and are, says Kent, the fruits of modern invention. But, continues the same author, in the time of the latter emperors, the professors in the different sciences began to be allowed regular salaries from the government, and to become objects of public regulation and discipline. By the close of the third century, these literary establishments, says he, began to assume the appearance of public institutions; and privileges and honors were bestowed upon the professors and students, who were subjected to visitation and inspection, by the civil and ecclesiastical powers. It was not, however, until at least the thirteenth century that colleges and universities began to *confer degrees,* and to attain the authority and influence they now enjoy. It is true, there were numerous students at Oxford, and professors who read lectures in grammar, rhetoric, divinity, astronomy, philosophy, &c.; but still that seminary, like others, was usually called a school, and was not furnished with the power of granting public distinctions, like degrees. The University of Paris was the first which assumed the form of our modern colleges."

"* * * To hold that the legislature, by a general law, intended that any three men in any town in the state, however illiterate or irresponsible, might organize and flood the state with doctors of medicine, doctors of law, doctors of divinity, masters of arts, civil engineers, and all the other various titles that everywhere in the civilized world have signified high attainments and special equipment for professional work, is to liken it to the witty French minister who threatened to create so many dukes that it would be no honor to be one, and a burning disgrace not to be one."

In our State, the power to confer degrees has traditionally been deemed to depend upon legislative grant. As we have already mentioned, the power was expressly stated in the special acts of incorporation,[2] and by c. 116 of the *Laws of* 1889, already cited, the power to confer degrees, other than for medicine, dentistry, or law, was expressly granted to colleges founded under a general statute.

That the Legislature may provide for licensure of medical colleges and condition the license upon suitable standards was held in *State Board of Medical Examiners of New Jersey v. The College of Mecca of Chiropractic, Inc.,* 6 *N. J. Misc.* 677, 142 *A.* 409 (*Sup. Ct.* 1928), affirmed o. b. 106 *N. J. L.* 602 (*E. & A.* 1929), and in further litigation between those parties, 113 *N. J. L.* 327 (*E. & A.* 1934). Shelton accepts those decisions but would avoid them because they involved the practice of a profession rather than the academic bachelor degree with which we are concerned. The point pressed is that as to professional matters there is danger from incompe-

2 Drew University—*L.* 1868, *c.* 2, *p.* 4; Seton Hall University—*L.* 1861, *c.* 86, *p.* 198; St. Peter's College—*L.* 1872, *c.* 487, *p.* 1117; St. Michael's Monastery—*L.* 1866, *c.* 319, *p.* 753; Stevens Institute of Technology—*L.* 1870, *c.* 52, *p.* 166. Rutgers—The State University (see charter of Queen's College, March 20, 1770, *pp.* 3, 6, 7), and Princeton University (*Elliott, Charters and Basic Laws of Selected American Universities and Colleges* (1934), *p.* 422), received royal charters which authorized the granting of degrees. One college, now Centenary College for Women, was formed under a special act, *L.* 1867, *c.* 103, *p.* 172, which did not expressly give the power to grant degrees, but apparently that power was thought by the· College to be implied under that statute or the act (*Rev.* 1847, *Title* XII, *c.* 2, *p.* 393, approved April 16, 1846) to which it was a supplement, and it seems the State Board accepts that view.

tence and fraud, and hence there is an evil to which the police power may be addressed, whereas with respect to academic education there is no necessity for governmental intervention. But the claim that the public needs no protection with respect to a nonprofessional degree rests upon nothing more than argumentative assertion.

We have no difficulty in assuming the Legislature found a public interest in the bachelor degree, for it is commonplace that government and private segments of our society look to the degree for evidence of achievement and capacity. Hence the opportunity for imposition upon the student and those who will deal with him is quite as evident as in the case of a professional degree. Indeed, today some or all of the study required for the bachelor degree is prerequisite for most professional degrees, and licensing authorities, as for example our own Court, must depend upon the quality of the instruction given by the colleges, academic as well as professional.[3]

It was an undisputed need for standardization with respect to degrees, both academic and professional, which sparked the development of private accreditation. But useful as private accreditation has been, it cannot deal directly with the non-accredited school. It cannot stop the substandard school or close the out-and-out degree mill. Hence bogus degrees have been vended, and no doubt still are, not only to citizens here but as well to residents of foreign countries, who, familiar with their own controls over academic standards, cannot "understand that an academic or professional degree from some fly-by-night university or college in the United States may be little more than a scrap of paper." *Reid, American Degree Mills* (1959), *p.* 19. In 1950 the education editor of the *New York Times* estimated there were more than 1,000

---

[3] Thus our rules for admission to the bar require the successful completion in residence of three-fourths of a four-year course of study for a bachelor's degree at institutions accredited by one of six named associations, *R. R.* 1:20–1(e), and the award of a bachelor's degree by a law school approved by the American Bar Association, *R. R.* 1:20–1(f).

unethical institutions of which at least 100 were outright diploma mills, with an annual take of $75,000,000 from 750,-000 students. *Reid, p. 7.*

The statute of 1912, which sought for the first time in our State to protect the academic degree by requiring the "approval" of the State Board of Education, was a direct response to the widespread concern over the abuse of the public. Educators themselves had called for legislative intervention. In 1897 the president of Northwestern University said:

"The cause of professional as well as academic education suffers from the want of adequate State supervision. * * * This sort of thing, impossible in Europe, should be made impossible in America. Such a condition of affairs is demoralizing beyond question. The tendency of it is all in the direction of low standards. It imposes on the public a class of educational charlatans and works injury to the students whom it falsely pretends to educate." Quoted in *Selden, Accreditation: A Struggle over Standards in Higher Education* (1960), *p.* 49.

In 1897 the National Education Association resolved "that the States should exercise supervision over degree-conferring institutions through some properly constituted tribunal having the power to fix a minimum standard of requirements for admission to or graduation from such institutions, and with the right to deprive of the degree-granting power such institutions not conforming to the standards so prescribed." *Reid, op. cit., supra, p.* 13. In 1907 Woodrow Wilson, then president of Princeton University, proclaimed that "We are on the eve of a period when we are going to set up standards," *Selden, op. cit., supra, p.* 36, and five years later, as Governor of this State, he signed the 1912 enactment to that end.

As of 1959 apparently less than half the States required governmental approval of a school as prerequisite for the conferring of a degree. *Reid, op. cit., supra, p.* 73. The problem being thus but partly resolved, the Council of State Governments in 1961 prepared a model statute which would require such approval. We quote the "Declaration of Policy" since it

sums up the public need for regulation as a legislature could undoubtedly find it:

"It is the policy of this state to prevent deception of the public resulting from the conferring and use of fraudulent or substandard degrees. Since degrees, diplomas and similar measures of academic achievement are constantly used by employers in judging the training of prospective employees; by public and private professional groups in determining qualifications for admission to and continuance of practice; and by the general public in assessing the extent of competence of persons engaged in a wide range of activities necessary to the general welfare, regulation by law of such evidences of academic achievement is in the public interest. To the same end, the protection of legitimate institutions and of those holding degrees from them is also in the public interest."

See also *Selden, op. cit., supra, pp.* 88–89.

 The public stake in education has never been more evident, for today higher education is essential for the survival of man himself. The academic degree is the more meaningful on that account. The State may protect it unless the police power is restrained by some constitutional guaranty. Shelton would find that restraint in the guaranty of free speech, arguing that the power to regulate the conferring of a degree could be used to harry an institution whose teachings may be unpopular. Shelton describes its own tenets in some such vein, but has not charged or attempted to prove that the State Board has subjected it to harassment. Rather Shelton relies upon the abstract possibility that a power to regulate could be used illicitly to destroy by indirection a value secured from destruction by the Constitution, and from that premise contends that the power to regulate may not be allowed at all.

 Of course the power to regulate does not depend upon a power to destroy. If government were denied the power to regulate unless it could also prohibit, there could hardly be law and order. Our statutes abound with needful restrictions upon rights of the person and of property notwithstanding the Constitution would protect those rights from destruction. Rather the Constitution condemns such

exercises of the police power as are arbitrary, and leaves it to its constituted officers to say when the boundaries of that power have been breached. *Meyer v. State of Nebraska*, 262 *U. S.* 390, 43 *S. Ct.* 625, 67 *L. Ed.* 1042 (1923).

Here there is no proof whatever that the State Board is bearing down upon Shelton because of Shelton's convictions upon any topic. Indeed, as we said at the outset, there is no record at all relating to the propriety of the standards adopted by the Board or their application to Shelton. The attack rests wholly upon the untenable proposition that the Constitution guarantees to everyone an absolute right to bestow the degree of bachelor of arts upon any basis or upon none at all.

## II

Next, Shelton says the statute fails to set forth a sufficient standard for the exercise of the legislative power delegated to the State Board and therefore violates our State Constitution, *Art.* IV, § I, ¶ 1, and *Art.* III, ¶ 1.

The statute does not tell the State Board what standards should be met by a college worthy of the power to confer a degree, nor does the statute specify areas within which the school's capabilities should be tested. Instead the whole subject is committed to the judgment of the State Board with a statement of the goal rather than of the path to be followed to reach it. Thus *N. J. S. A.* 18:2–4 empowers the State Board in subsection "*l*" to "Advance the education of people of all ages," and to that end equips the Board with sundry powers of which the following may be mentioned here from the catalogue in the section just cited:

"b. Prescribe and enforce rules and regulations necessary to carry into effect the school laws of this State;

\* \* \* \* \* \* \*

m. Establish standards of higher education;

. n. License institutions of higher education as authorized by sections 18:20–5, 18:20–6, and 18:20–7 of this Title;

o. Approve the basis or conditions for conferring degrees as authorized by sections 18:20–8, 18:20–9, and 18:20–10 of this Title;

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

u. The State Board shall have all other powers requisite to the performance of its duties."

Shelton's complaint is quite like the one rejected in *Douglas v. Noble*, 261 *U. S.* 165, 43 *S. Ct.* 303, 67 *L. Ed.* 590 (1923). That case involved a state statute concerning the practice of dentistry. The attack made under the Fourteenth Amendment was based upon the claim that the discretion given the board of examiners with respect to licensure was so standardless as to furnish no guard against arbitrariness. Specifically the complaint was the legislature did not itself fix the scope or the character of the qualifying examination but rather left it to the board to decide what would demonstrate fitness to practice dentistry. The highest court of the State had held the statute was not intended to authorize arbitrary action, and of course the United States Supreme Court accepted that judicially found restriction. The Supreme Court unanimously upheld the statute, saying that, although the legislature could itself specify (1) what knowledge and skill will fit one to practice dentistry and leave it to the board to decide (2) whether the individual applicant had the specified knowledge and skill, the legislature was free to commit both matters to the agency, adding that "it is not to be presumed that powers conferred upon the administrative boards will be exercised arbitrarily." (261 *U. S.*, at *p.* 170, 43 *S. Ct.*, at *p.* 305, 67 *L. Ed.*, at *p.* 593.)

And so in the case at hand, the Legislature, to protect the sundry interests in the integrity and value of the bachelor degree, could itself have written the qualifying specifications for the school and then left it to the Board to decide in each case whether the specifications were met. But the Legislature could decide, as it did, that the wiser course was to leave it to the Board to make the specifications, thus to profit from the expertise of the Board and to permit those specifications to develop with a changing educational scene. Whether that approach to the problem will better serve the public interest is itself a matter which the Constitution com-

mits to the judgment of the Legislature. The judiciary of course may not intervene unless the legislative decision is palpably arbitrary. There is nothing before us to suggest the Legislature exceeded its constitutional authority in deciding to delegate the subject in such fullness to the State Board. Nor is there any reason to suppose the Legislature intended that the power thus delegated may be used by the Board capriciously. On the contrary, it is elementary in our State that delegated power must be exercised reasonably in its substantive aspects and that the procedural demands of due process must be honored whenever they apply. The statutory provision for rules and regulations plainly imports that the Legislature had these fundamental values in mind.

 As we have said, the attack in *Douglas v. Noble, supra,* was under the Fourteenth Amendment. Here Shelton invokes provisions of our State Constitution. We therefore add that our Constitution is no more restrictive. We have recognized the power of the Legislature to leave with an administrative agent the task of achieving a goal, expressed or implied, if the Legislature could reasonably believe it was better to have the agency prepare the blueprint. Thus in *Elizabeth Federal S. & L. Ass'n v. Howell,* 30 *N. J.* 190 (1959), we held it permissible to have the Commissioner of Banking and Insurance decide when a branch office would be "in the public interest," saying (at *p.* 194) :

" 'Public interest,' of course, is a broad concept. The constitutional sufficiency of terms of such sweep may not be judged in a vacuum. The context must be considered, for the context may give concreteness to what seems abstract, or may demonstrate that despite its generality a broad standard is all that may sensibly be expected if delegated authority is to be equal to the sundry situations which may arise and for which a more precise formula cannot be devised without hurtful inflexibility. There must be an appropriate concession to the complexity of government and the practical inability of the legislative branch to deal with the details of administration. In the present situation 'public interest' is adequate. It acquires content from the overall objective of the statute to achieve a sound banking structure, healthily competitive, and fully adequate for the needs of the community. And it is difficult to conceive of a standard which would be

both more precise and equally workable. See *Ward v. Scott,* 11 *N. J.* 117, 124 (1952) ; *Schierstead v. City of Brigantine,* 20 *N. J.* 164, 169 (1955) ; *Lane v. Holderman,* 23 *N. J.* 304, 319 (1957)."

The subject was discussed comprehensively in *Ward v. Scott,* 11 *N. J.* 117, 123 (1952), where a number of instructive examples are assembled. See also *In re Berardi,* 23 *N. J.* 485, 491 (1957) ; *Moyant v. Paramus,* 30 *N. J.* 528, 553 (1959), and *Sprissler v. Pennsylvania-Reading Seashore Lines,* 45 *N. J.* 127, 135–136 (1965).

### III

Shelton further charges the statute creates an unconstitutional classification in that it exempts colleges which had the power to confer the degree 25 years before the enactment of the statute. It will be recalled that historically the power to confer a degree was granted in special acts of incorporation and that colleges formed under a general act of incorporation were first vested with that power in 1889. Hence when in 1912 the "approval" statute (*c.* 315) was first enacted, the 25-year exemption referred to the year 1887 and thus excluded degree-conferring colleges which had received the degree-conferring power by special charter grant. When the 1912 statute was replaced by the more comprehensive 1916 statute (*c.* 152), the 25-year provision was continued. In the *Revised Statutes of 1937* the revisers measured the 25-year period from 1916 rather than 1912 and accordingly inserted the year 1891. We can see no reason why the Legislature in 1916 would have wanted to change the critical date for exemption fixed in the 1912 statute. Measured from 1912 the 25-year period is understandable, whereas if measured from 1916, no relevancy is apparent. We are satisfied the 1916 statute intended no change in that regard, and that the provision should be read to refer to the year 1887 rather than 1891 as the *Revised Statutes* now read. See *R. S.* 1 :1–4.

The question then is whether the exemption from this regulatory measure of degree-conferring colleges which had re-

ceived the degree-conferring power by special acts of incor-
poration 25 or more years before the statute was enacted cre-
ated a constitutionally impermissible class.

Shelton cites *State v. DeWitt School, Inc.,* 151 *Conn.* 631,
201 *A. 2d* 472 (*Sup. Ct. Err.* 1964). There a statute dealing
with the power to award degrees exempted any school which
used "junior college" or "college" or "university" in its name
for five years prior to October 1, 1947. Deeming the purpose
of the statute to be "to protect the public from misrepresenta-
tions" (201 *A. 2d,* at *p.* 473), the court could see no basis for
the classification. The court relied upon *Morey v. Doud,* 354
*U. S.* 457, 77 *S. Ct.* 1344, 1 *L. Ed. 2d* 1485 (1957).

*Morey v. Doud* involved a statute dealing with the issuance
of money orders. It provided for licensure upon a finding of
promotion of convenience and advantage and required such
things as surety bonds and minimum funds on hand. Ex-
empted, however, were money orders of American Express
Company. The majority of the Court found the classification
thus made was offensive, saying (354 *U. S.,* at *p.* 467, 77 *S.
Ct.,* at *p.* 1351, 1 *L. Ed. 2d,* at *p.* 1493) :

"\* \* \* Although statutory discriminations creating a closed class
have been upheld, a statute which established a closed class was held
to violate the Equal Protection clause where, on its face, it was 'an
attempt to give an economic advantage to those engaged in a given
business at an arbitrary date as against all those who enter the
industry after that date.' *Mayflower Farms, Inc. v. Ten Eyck,* 297
*U. S.* 266, 274, 56 *S. Ct.* 457, 80 *L. Ed.* 675, 679."

In a footnote the majority opinion cited prior cases in which
closed classes were sustained. It referred to *Watson v. State
of Maryland,* 218 *U. S.* 173, 30 *S. Ct.* 644, 54 *L. Ed.* 987
(1910), which upheld a "grandfather" clause exempting from
licensure physicians who had practiced medicine on a speci-
fied date and had treated a specified number of patients per
year thereafter; *Sampere v. New Orleans,* 166 *La.* 776, 117
*So.* 827 (*Sup. Ct.* 1928), affirmed 279 *U. S.* 812, 49 *S. Ct.*
262, 73 *L. Ed.* 971 (1928), which upheld the familiar exemp-
tion of existing nonconforming zoning uses; and *Stanley v.*

*Public·Utilities Commission,* 295 *U. S.* 76, 55 *S. Ct.* 628, 79 *L. Ed.* 1311 (1935), where the statute upheld exempted from a requirement for proof of public convenience and necessity those carriers which had served a given route over a stated period of years.

Thus *Morey v. Doud,* which started with the premise that a classification may be denounced only if it is "invidious" (354 *U. S.,* at *p.* 463, 77 *S. Ct.,* at *p.* 1344, 1 *L. Ed. 2d,* at *p.* 1490), did not condemn every exemption based upon pre-existing activity. Rather it found to be invidious a classification which on its face sought to give a competitive economic advantage to those already in the business to be regulated.

 The power to classify is pervasive, and a court may not declare the legislative judgment to be invalid unless, as we have said, the classification is "invidious." The burden of so proving is a heavy one, see *New Jersey Restaurant Association v. Holderman,* 24 *N. J.* 295, 300–303 (1957), and the burden is not obviated merely because the classification depends upon a date. It remains to be shown that the date is not relevant to the legislative aim and that there is no reasonable basis upon which the Legislature could find the exemption is fair or prudent. And where the evaluation depends upon the factual milieu, as we apprehend is here the case, the burden is upon the complainant to make the record, which, as we have noted, Shelton made no effort to do.

Here the Legislature apparently used a date as a way to identify colleges which had received the degree-conferring power under a special act of incorporation.[4] Perhaps the Legislature concluded that where a prior Legislature had thus made an individual determination that the recipients of the degree-conferring power were equipped to discharge the responsibility involved, the college ought not to be called upon

---

[4] We understand the State Board deems the exemption applicable only to the colleges listed in fn. 2. In response to an argument made before us by Shelton, the State Board said that other colleges which existed in 1912 and now grant degrees, in fact applied for and received "approval" from the Board.

to seek initial approval again. Perhaps the Legislature entertained doubt as to whether the degree-conferring power could be taken away from any, or some, of the colleges which held it by special acts of incorporation,[5] and rather than risk a challenge to the new statute on that account, chose to improve the total scene by such limited activity as was beyond contest, perhaps with the hope that the executive branch could question by litigation the right of such a college to exercise the degree-conferring power if it were no longer equal to the responsibility implied in the grant of the power. *Cf.* Annotation, 46 *A. L. R.* 1478 (1927); *Elliott, Colleges and the Courts* (1936), *pp.* 204–208. Perhaps the Legislature concluded that it could secure the maintenance by the exempted colleges of proper standards under the *licensing* provisions of *N. J. S. A.* 18:20–5, which apply to all degree-conferring colleges without exception. Indeed we understand the Board to say that all such colleges are examined by its representative along with the representatives of the Middle States Association of Colleges and Secondary Schools, one of the private accreditation organizations, and that those colleges do meet the standards of the Board.

 It seems evident that the constitutional issue cannot be resolved intelligently in the absence of a full factual picture. If it were necessary to decide the issue in order to con-

---

5 In the *Dartmouth College* case, *supra*, 4 *Wheat.* 518, 4 *L. Ed.* 629 (1819), it was held that the articles of incorporation constitute a contract with the State protected by the Federal Constitution. That doctrine has been thought to prevent the State from taking away the power to confer degrees granted in a corporate charter. See *Reid, op. cit., supra, pp.* 62–63. By statute in 1846, *p.* 17, the Legislature ordained that the State would retain the power to alter, suspend, and repeal any charter it or its successors might thereafter grant. See *Seton Hall College v. Village of South Orange*, 242 *U. S.* 100, 37 *S. Ct.* 54, 61 *L. Ed.* 170 (1916). By amendment to the State Constitution in 1875, the Legislature was prevented from granting a corporate charter other than by general law, and the State's power to amend, alter or repeal was expressly set forth. *Art.* IV, § VII, ¶ 11, now *Art.* IV, § VII, ¶ 9 of the *Constitution of* 1947. The 1846 statute of course could not conclude subsequent Legislatures and hence there continued the question whether a special act adopted after 1846

clude this case, it might be appropriate to permit Shelton to make a record even now. But that course seems unwarranted, for we are satisfied that if the exemption clause were invalid, the statute would nonetheless survive. There is no reason to suppose the Legislature would be so opposed to overseeing the exempted schools that it would prefer to have the degree-conferring power go unregulated in this important respect. As we noted earlier, the 1916 statute contained an express severability clause, and we find support in that provision for our evaluation of the legislative intent. We are therefore satisfied that if Shelton could demonstrate factually that the classification is bad, Shelton nonetheless could not escape the statute's provisions. This being so, we need go no further, especially since the institutions which would be affected if the exemption fell are not parties to this litigation.

## IV

Finally, Shelton contends that, assuming the statute is valid, nonetheless the State Board had no power to condition the "approval" upon terms to be met and thus to subject the "approval" to annual decisions as to whether it should be withdrawn for failure to attain the standards.

but prior to the 1875 amendment to the Constitution was nonetheless intended to constitute an unalterable contract. See *State of New Jersey v. Yard*, 95 *U. S.* 104, 24 *L. Ed.* 352 (1877). There was also the question whether the reserved power should be construed to include the revocation of the authority to confer a degree if the reserved power should be found to permit only alterations "which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the legislature may deem necessary to secure either that object or any public right," *Berea College v. Commonwealth of Kentucky*, 211 *U. S.* 45, 57, 29 *S. Ct.* 33, 53 *L. Ed.* 81, 86 (1908). We should not be understood to encourage the thought that the degree-conferring authority is beyond the police power even where the charter antedates the 1846 statute, or to suggest that the reserved power is to be viewed niggardly. See *Brundage v. New Jersey Zinc Co.*, 48 *N. J.* 450 (1967) : *In re Collins-Doan Co.*, 3 *N. J.* 382, 390–391 (1949). We note the state of the law only to suggest the Legislature may have created the class in question to avoid a constitutional issue and not for some invidious purpose.

We see no reason to deny the State Board the power to give a conditional "approval." The alternative would be to require all standards to be met at once. New colleges would find it difficult to get under way if total compliance were prerequisite. The State Board's approach is in the public interest and is amply authorized by *N. J. S. A.* 18:2–4(u) which grants the Board "all other powers requisite to the performance of its duties." *Cf. Cammarata v. Essex County Park Comm'n,* 26 *N. J.* 404, 411 (1958).

The resolution under appeal is therefore affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For reversal* — None.