176 N.J. Super. 553 (1980)
424 A.2d 435
IN THE MATTER OF THE BOARD OF EDUCATION OF THE CITY OF TRENTON, MERCER COUNTY.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1980.
Decided December 23, 1980.
*556 Before Judges MATTHEWS, MORGAN and MORTON I. GREENBERG.
Bruce M. Schragger argued the cause for appellant (Schragger, Schragger & Lavine, attorneys; Merlino, Rottkamp & Grillo, on the brief).
Mary Ann Burgess, Deputy Attorney General, argued the cause for respondent State Board of Education (John J. Degnan, Attorney General, attorney; Stephen Skillman, Assistant Attorney General, of counsel; Alfred E. Ramey, Jr. and Mary Ann Burgess, Deputy Attorneys General, on the brief).
Frederica Hochman argued the cause for intervenors Puerto Rican Congress and Council of Puerto Rican Organizations (Kathryn A. Brook, attorney).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
On February 5, 1979, the Commissioner of Education ordered the Trenton Board of Education and its superintendent to show cause at a hearing to begin March 5, 1979 why the commissioner should not appoint a special agent or take other appropriate action to remedy educational deficiencies in the district school system. Prior to the hearing, a notice of motion to intervene was filed by the Puerto Rican Congress and the Council of Puerto Rican Organizations, requesting leave to intervene in proceedings relating to the board's alleged failure to provide an adequate bilingual education. The motion was granted.
*557 Hearings on the order to show cause were held on March 5, 6, 13, 15 and 21, 1979, before an Assistant Commissioner of Education, Division of Controversies and Disputes. At the close of the State's case, the board moved to dismiss and, alternatively, for summary judgment. The hearing officer's initial decision, rendered October 5, 1979, advised the commissioner to deny both motions; made findings of fact with respect to each alleged educational deficiency, and recommended a plan for corrective action.
The decision of the commissioner, dated November 7, 1979, denied the board's motions to dismiss and for summary judgment; adopted the findings of the hearing examiner, and found that the recommended plan for corrective action was "entirely suitable," with the exception of one item. The State Board of Education issued an administrative order on November 8, 1979, directing implementation of the plan for corrective action. This appeal followed.
During 1977 the State Department of Education received information indicating that certain deficiencies existed in the Trenton public school system. The commissioner accordingly directed that the system be monitored and investigated. As a result of that action, the department was able to document numerous deficiencies in a report issued in January 1978. Consequently, the Trenton board was ordered to prepare a plan to remedy those deficiencies. The Trenton board submitted a remedial plan to the commissioner in March 1978. However, that remedial plan was never fully implemented and, on February 5, 1979, the commissioner ordered the board to show cause why corrective action should not be taken. That order alleged continuing deficiencies in special education, bilingual education, and affirmative action programs; in the safety and adequacy of school facilities; in timely submission of reports and documents required by law, and in efficiency of administrative procedures, sufficiency of the 1978-79 school budget, and employment of *558 teaching staff members to fulfill the needs of the school district.[*]
The State presented numerous witnesses and exhibits at the March 1979 hearing. Based upon the evidence, the hearing examiner found: (1) Special education: The board has failed to provide adequate personnel and services for evaluation and classification of handicapped pupils; has failed to develop and implement an educational plan for each such pupil; has failed to provide adequate resource rooms and programs for handicapped pupils; has failed to avail the school district of available funds for special education, and teaching staff members have failed to refer potentially handicapped pupils to child study teams. (2) Affirmative action: In view of the board's past performance in the area of affirmative action, corrective measures are necessary to insure implementation of the affirmative action plan approved in August 1979. (3) School facilities: Numerous health and safety deficiencies exist in six elementary schools. (4) Bilingual education: The board has failed to provide adequate bilingual educational programs for eligible pupils. (5) Submission of reports: The board has consistently failed to submit required reports and documents in a timely manner. (6) Efficient administrative procedures, sufficiency of the 1978-1979 school budget, and employment of teaching staff members: The board has impeded the adoption of plans for compensatory education and affirmative action; has disregarded recommendations of administrative and supervisory staff and officials of the Department of Education, and does not act as a unified body. Furthermore, the board's minutes are kept in a manner which obfuscates the record of transaction of business. The board has also failed to follow proper procedures, pursuant to N.J.A.C. 6:8-4.3, for employing teaching staff members; there is evidence of "gross mismanagement" by the board in the employment, *559 transfer, and promotion of personnel; some members of the board act as patrons for individuals seeking employment, transfer, or promotion; the board's policy of requiring that three candidates be recommended for each available position is inefficient, and finally, the board has continued the illegal practice of requiring that staff recommendations identify the person's race and sex.
In short, the report discloses that the educational system of the City of Trenton is in an abysmal state, due almost entirely to the mismanagement and incompetence of the members of the local board of education.
The board accepts, it claims, for purposes of this appeal, the factual findings of the hearing examiner which were adopted by the commissioner in his decision rendered on November 7, 1979. The ground for this appeal is the plan for corrective action recommended by the hearing examiner and adopted by the commissioner.
That corrective action plan provides:
The Commissioner shall appoint and assign a monitor general to full time service within the district as a general supervisor of all activities conducted by the school district. The monitor general shall report directly to the Commissioner concerning the total operation of the school district for the 1979-80 and 1980-81 school years.
... The school district shall assume the cost for the services of the monitor general and two assistants, as well as for secretarial support services, to a maximum of $125,000 per year.
The plan also provides for continued monitoring by Department of Education and county personnel and allows the commissioner to require the board to engage the services of an independent auditor, to order transfer of moneys in the school budget, and to direct the county board of taxation to raise additional fiscal resources. The monitor general and the county superintendent must approve any budget increase. The plan requires that the county superintendent conduct in-service training programs for board members, district administrative and supervisory staff, and other teaching staff members. In the area of affirmative action, the monitor general and county superintendent must *560 monitor implementation of the board's affirmative action plan and the district must submit monthly progress reports. Regarding special, compensatory, and bilingual education programs, the monitor general and county superintendent "shall be empowered to direct the district's personnel to take all steps necessary to operate a thorough and efficient program [of special, compensatory, and bilingual education]." District personnel must "prepare a comprehensive plan for the provision of needed school facilities" and must formulate plans for staffing all educational programs in the district. The monitor general and county superintendent must review all personnel staffing recommendations and present them to the board for formal approval. "The board shall not be permitted to table such recommendations, but shall conduct a recorded roll call vote upon them as required by law. If any board member wishes to oppose such recommendations, he/she shall state such objection which shall be recorded in the minutes of the meeting. No recommendation of personnel shall be identified by any code designating sex and/or race." Also, included in the plan is a provision that the board may not make any recommendations for appointment, transfer, or promotion of certified support service personnel; may not require that three candidates be recommended for each position of employment, and may only consider personnel matters once each month as a committee of the whole. The corrective action plan includes, as well, provisions regarding board operations and submission of annual reports detailing progress in meeting the requirements of the plan.
The commissioner's decision adopted in full the findings of the hearing examiner as well as the recommended plan for corrective action, with one exception: the commissioner reduced the amount the school district must assume for the cost of services of the monitor general and support staff from $125,000 to $85,000 per year. The State Board of Education's administrative order of November 8, 1979 directed the board to implement the corrective action plan.
*561 The Trenton board first argues that N.J.S.A. 18A:7A-15 is so devoid of standards and guidelines so as to constitute an unlawful delegation of legislative power to the State board.

I.
The corrective plan is imposed under the authority of N.J.S.A. 18A:7A-14 and 15, which provide:
... If the commissioner shall find that a school or a school district has failed to show sufficient progress toward the goals, guidelines, objectives and standards, including the State goal and any local interim goal concerning pupil proficiency in basic communications and computational skills, established in and pursuant to this act, he shall advise the local board of education of such determination, and shall direct that a remedial plan be prepared and submitted to him for approval. If the commissioner approves the plan, he shall assure its implementation in a timely and effective manner. If the commissioner finds that the remedial plan prepared by the local board of education is insufficient, he shall order the local board to show cause why the corrective actions provided in section 15 of this act should not be utilized. [N.J.S.A. 18A:7A-14]
If, after plenary hearing, the commissioner determines that it is necessary to take corrective action, he shall have the power to order necessary budgetary changes within the school district, to order in-service training programs for teachers and other school personnel, or both. If he determines that such corrective actions are insufficient, he shall have the power to recommend to the State board that it take appropriate action. The State board, on determining that the school district is not providing a thorough and efficient education, notwithstanding any other provision of law to the contrary, shall have the power to issue an administrative order specifying a remedial plan to the local board of education, which plan may include budgetary changes or other measures the State board determines to be appropriate. Nothing herein shall limit the right of any party to appeal the administrative order to the Superior Court. [N.J.S.A. 18A:7A-15; emphasis supplied]
The board contends that the lack of standards or guidelines delineating "other [appropriate] measures" renders the statute unconstitutional. We disagree.
N.J.S.A. 18A:7A-14 and 15 are part of the Public School Education Act of 1975, N.J.S.A. 18A:7A-1 et seq. In Robinson v. Cahill (Robinson V), 69 N.J. 449, 467 (1976), the court found the act "is in all respects constitutional on its face." Regarding N.J.S.A. 18A:7A-15, the court stated:
The Constitution imposes upon the Legislature the obligation to "... provide for the maintenance and support of a thorough and efficient system of free *562 public schools ..." The imposition of this duty of course carries with it such power as may be needed to fulfill the obligation. The statutory language quoted and discussed above [N.J.S.A. 18A:7A-14 and 15] constitutes a delegation of this power to the State Commissioner of Education as well as to the State Board of Education to see that the constitutional mandate is met. The have, for this purpose, been made legislative agents. They have received a vast grant of power and upon them has been placed a great and on-going responsibility. [69 N.J. at 460-461]
It is axiomatic that the Legislature may commit a subject to the judgment of an administrative agency with a statement of the goal to be reached rather than the path to be followed to reach it. Shelton College v. State Bd. of Ed., 48 N.J. 501, 516-518 (1967). The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards. Ward v. Scott, 11 N.J. 117, 123-124 (1952). See also, Avant v. Clifford, 67 N.J. 496, 550 (1975). Rather than requiring detailed standards to protect against the arbitrary exercise of administrative authority, our courts have emphasized procedural safeguards, plus legislative, judicial or executive checks. Avant v. Clifford, above, 67 N.J. at 551. The existence of such safeguards is an important factor in determining whether a grant of power to an administrative agency is invalid because of lack of proper limitations upon agency discretion. Ibid. See also 1 Cooper, State Administrative Law, at 74-91 (1965); 1 Davis, Administrative Law Treatise, § 3:15 at 207-208 (2 ed. 1978).
The delegation of power to the State Board of Education under N.J.S.A. 18A:7A-15 is broad: in cases where the State board determines that the school district is not providing a thorough and efficient education, it has "the power to issue an administrative order specifying a remedial plan to the local board of education, which plan may include budgetary changes or other measures the State board determines to be appropriate." (Emphasis supplied). This broad grant of power, however, is accompanied by safeguards. N.J.S.A. 18A:7A-14 provides for notice and a hearing before corrective action may be taken by the State board. The hearing before the commissioner *563 must be conducted pursuant to regulations, N.J.A.C. 6:24-1.11 to 1.19, which provide, among other things, for the issuance of subpoenas, the offering of evidence, a stenographic transcript of the proceeding, and a written decision by the commissioner, including findings of fact and conclusions of law. Any party may appeal the administrative order to the Superior Court. N.J.S.A. 18A:7A-15. Thus, those affected by the administrative order have the opportunity to present their views fully to the administrative agency before official action is taken; judicial review is available to protect any abuses. These procedural and judicial safeguards, in our view, prevent an unlawful delegation of power to the State board.

II.
The board contends that it is beyond the statutory authority of the State board to order the commissioner to "assign a monitor general to full time service within the district as a general supervisor of all activities conducted by the district."
... the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent. [citations omitted] In determining whether a particular administrative act enjoys statutory authorization, the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives. [New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562 (1978)]
See also In re Suspension of Heller, 73 N.J. 292, 303 (1977). We find that authority to appoint a monitor general with general supervisory powers may readily be inferred from Title 18A. N.J.S.A. 18A:4-10 delegates to the State board "[t]he general supervision and control of public education in this state, except higher education...." The commissioner is charged with the duty of supervising State schools and enforcing rules prescribed by the State board. N.J.S.A. 18A:4-23. In order to carry out this responsibility, the commissioner may assign duties to inspectors, assistants, and employees of the State Department of Education. N.J.S.A. 18A:4-22(d). Thus, the appointment of an *564 assistant to supervise implementation of a plan to remedy deficiencies within a school system is an incidental power reasonably necessary and appropriate to effectuate the commissioner's statutory responsibilities. See New Jersey Guild of Hearing Aid Dispensers v. Long, above, 75 N.J. at 562.
The board also objects to the provision of the corrective action plan which authorizes the monitor general and county superintendent to "direct the district's personnel to take all steps necessary to operate a thorough and efficient program [of special, compensatory, and bilingual education]." We disagree with the board's contention that the State board has exceeded its statutory authority in imposing this provision. Under N.J.S.A. 18A:7A-15, the State board has the power to issue an administrative order specifying a remedial plan to the local board of education. This plan may include whatever measures the State board deems appropriate to remedy educational deficiencies within the school district. N.J.S.A. 18A:7A-15. The responsibility for specifying such measures is explicitly placed upon the State board and there is nothing in the statute or elsewhere in Title 18A which suggests that the State board may not carry out this responsibility through its designated agents.
As modified by the commissioner's decision of November 7, 1979, the corrective action plan requires that the board assume the cost of the services of the monitor general, two assistants, and secretarial support services. The board argues that there is no authority in Title 18A for payment by local school districts for services of Department of Education employees. In our view, this provision of the corrective action plan does not contravene the express policy of Title 18A, thus requiring it to be set aside. Here, the State board has authorized the commissioner to appoint an assistant to supervise implementation of the corrective action plan in the Trenton public schools. The appointment of this assistant is necessitated by the moribund administration of the local school board. His function is to fill the void created by the non-feasance of that body. While *565 the appointee is probably a state employee in the technical sense, his activities are carried out exclusively for the local district which in actuality is a creature of the state instituted as the agent to carry out the constitutional mandate to educate our young.
Finally, the board argues that the provision of the plan which requires board members to state on the record reasons for any objection to personnel recommendations violates their right to free speech. The constitutionally guaranteed right to free speech includes, of course, both the right to speak freely and the right to refrain from speaking at all. Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). However, local school board members are public officers charged with a public duty. School board members are obliged to examine qualifications of teachers, to exercise judgment and discretion in their selection, and to confer and compare judgments in order to reach proper results. Townsend v. School Trustees, 41 N.J.L. 312, 313 (Sup.Ct. 1879). In sum, the selection of teachers is "an act judicial in its nature ..." Ibid. Public officers acting in a quasi-judicial capacity are required to state reasons for their actions. See Application of Howard Savings Institution of Newark, 32 N.J. 29, 52 (1960).

III.
The board alleges that it was denied due process because its case was investigated, prosecuted, and adjudicated by the State Department of Education. The board does not claim any "actual bias on the part of the hearing examiner but rather than the probability of actual bias [in] ... the entire process is too high to be constitutionally tolerable." This contention we find to be without merit. "The wisdom of creating an agency with a responsibility for both initiating and adjudicating a proceeding is a legislative function, and not a judicial one." In re Information Resources, 126 N.J. Super. 42, 52 (App.Div. 1973); In re Larsen, 17 N.J. Super. 564, 569-570 (App.Div. 1952). "[T]he mere *566 fact that the administrative agency has investigated the matter in question does not render it or its members incompetent, consistent with due process, to adjudicate the case as presented at the evidentiary hearing." Rite Aid Corp. v. Bd. of Pharmacy of State of N.J., 421 F. Supp. 1161, 1177 (D.N.J. 1976), app. dis. 430 U.S. 951, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977). See also Withrow v. Larkin, 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712, 728 (1975).
We have no hesitancy in concluding that the determination of the State board should be affirmed in all respects. The program of the commissioner as endorsed by the State board represents in our judgment an intelligent and conscientious compliance with the constitutional mandate that the young citizens of our State receive a thorough and efficient education.
Affirmed.
NOTES
[*] Allegations of the order regarding failure to provide programs for gifted children and failure to employ qualified aides were not addressed at the hearing and, accordingly, were dismissed by the hearing examiner.