STATE of Tennessee, ex rel. Brooks McLEMORE, Attorney General and Reporter for the State of Tennessee, Plaintiff-Appellee,

v.

CLARKSVILLE SCHOOL OF THEOLOGY, Dr. W. Roy Stewart, President, Clarksville School of Theology, Ernestine King Stewart, Roy Machen, George H. W. Phillipp, and Frank G. Ester, Individually and as Officers of Administration, Clarksville School of Theology, Defendants-Appellants.

Supreme Court of Tennessee.

Aug. 2, 1982.

Paul Welker, Clarksville, Thomas R. McCoy, Nashville, for defendants-appellants.

Frank J. Scanlon, Asst. Atty. Gen., for plaintiff-appellee; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

BROCK, Justice.

The Clarksville School of Theology is a postsecondary degree-granting school of theology which has not complied with the requirements for degree-granting institutions established by the Tennessee Higher Education Commission pursuant to the Postsecondary Education Authorization Act of 1974, T.C.A., § 49–3901 et seq. The Attorney General, as authorized and directed by T.C.A., § 49–3924, brought this action for declaratory and injunctive relief seeking to prohibit the Clarksville School of Theology from granting degrees until it shall meet the requirements of the Act.

The School contends that application of the Act to it would deprive it of its right of free exercise of religion, guaranteed by the First Amendment to the Constitution of the United States and by Art. I, Section 3, of the Tennessee Constitution. The School alleges that its budget will not permit it to meet the criteria of the Act and that it will be forced out of business if required to do so; it alleges further that, if it is not permitted to grant degrees, enrollments of students will decline so greatly that it will be forced out of business. The State contends that the granting of degrees is a purely secular activity and in no way affects the free exercise of religion by the appellants and, therefore, that the School should be required to comply with the law.

Upon an earlier appeal in this case, we remanded the cause to the trial court for further development of the facts. Upon the remand, a full evidentiary hearing was conducted, resulting in a well documented and detailed finding of fact and conclusions of law contained in a memorandum opinion filed by Judge Boaz, which, in pertinent part, we adopt as a part of this opinion, and is as follows:

.    .    .    .    .

"At said hearing there was a full development of facts with an extensive explanation of the procedure under the regulations of the State Postsecondary Education Commission as applied to similarly situated institutions, as well as an explanation of the study procedure, the courses covered and not covered, and the degrees awarded by the defendant School.

"In general, the Tennessee Higher Education Commission, according to the proof, followed the standards approved and in use by the Southern Association of Colleges and Schools, but the application was somewhat less stringent. The Act went into effect on July 1, 1975, and in October, 1975, the Clarksville School of Theology was sent an application form, and eventually, an application was filed by the defendant School on January 15, 1976. The application was denied on January 22, 1976, but the defendant School was permitted to complete its 25th year and it was agreed, according to the correspondence between the Commission and the defendant School, that the defendant would cease operation at that time. The defendant School has, however, continued to operate and to issue postsecondary degrees without approval of the Tennessee Higher Education Commission and in violation of the Act.

"The defendant School offered proof, through its President of 28 years, as to the program of study followed by its students and the degrees offered by the Clarksville School of Theology. He testified that the purpose of the institution was to help many preachers, especially Baptist, who had never had the opportunity to receive a theological degree. He stated that the School granted a Bachelor of Theology, a Master of Theology, and a Doctor of Theology. For the Bachelor's degree, for example, he stated that the

applicant must (1) have faith, (2) must be a pastor or evangelist, (3) must complete a 'synthetic Bible study' and write a thesis of 30,000 words. He further stated that the School teaches only religion, that no science, mathematics or any other such course was offered. He stated that a Bachelor of Theology degree for example, cost $25 at enrollment, $320 tuition and $30 for a cap and gown. He admitted that the students must attend only three 'seminars' on March 3, June 6, and October 10, this being the only classroom attendance required. He testified that the School must grant education degrees, or the students would not attend. Two additional witnesses testified they would not have attended the Clarksville School of Theology unless degrees were granted. It was shown, incidentally, that last year the School had 80 students and that the largest budget in one year had been $37,-000.00. The President of the defendant School testified that it was a non-profit School, that the receipts from tuition were used to maintain the buildings of the defendants.

"It seems to the court that the first question to resolve is whether or not the Postsecondary Education Authorization Act of 1974 was intended to apply to the defendant School. Under Tennessee Code Annotated, § 49–3902, the purpose of the Act is stated as: to provide for the protection, education, and welfare of the citizens of the state of Tennessee, its postsecondary educational institutions and its standards, by: (a) establishing minimum standards concerning the quality of education, ethical and business practices, health and safety, and fiscal responsibility, to protect against substandard, transient, unethical, deceptive, or fraudulent institutions and practices; and (b) authorizing the granting of degrees, diplomas, certificates or other educational credentials by postsecondary education institutions and prohibiting the granting of false or misleading educational credentials . . . .' It would seem that it was the intent of the legislature to include the defendant School, and, there being no words in the Act which would specifically exclude the defendant School, it is held that the Act does apply.

"The most important question and the one most difficult to resolve, due to its delicate nature, is the question of whether or not applying the Act to the defendant School would infringe upon defendant's right to the free exercise of religion as protected by the State and Federal Constitutions.

"The Act sets out the minimum requirements before a postsecondary educational institution will be issued the necessary authorization to operate. Only those institutions so authorized may issue educational credentials or degrees. The Act makes no attempt to regulate or control the religious beliefs, practices or teachings of any institution. The defendant School insists that it cannot operate unless it can issue educational degrees. However, it is not made to appear by the proof that issuing educational degrees is a religious tenet of the defendants, nor that the operation of the School is prompted or required by religious beliefs. In fact, the School is inhibited in no way by the Act as far as religion is concerned, the Act only proscribing the issuance of educational credentials by those institutions failing to meet the minimum requirements. The court holds, therefore, that applying the Act to defendant School does not violate the free exercise of religion clause of the Constitution, State or Federal.

"The School, as its President admits, has not and cannot meet the requirements of the Act, and yet it insists on the right to issue educational credentials, including a Bachelor of Theology, a Master of Theology and a Doctor of Theology. It is the inescapable conclusion of the court that these are false or misleading educational credentials, as specifically prohibited in (b) of T.C.A., § 49–3902.

"In view of the above decision, an injunction should issue prohibiting the defendants from issuing any further educational degrees."

■ If the Act placed a burden upon the free exercise of religion by the defendants or posed a threat of entanglement between the affairs of the church and the state, the state would be required to show that "some compelling state interest" justified the burden and that there exists no less restrictive or entangling alternative. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

■ We conclude, however, that this Act places neither a direct nor indirect burden upon the free exercise of religion by the defendants nor threatens an entanglement between the affairs of church and state. As the Chancellor noted in his memorandum opinion, above quoted, the Act does not regulate the beliefs, practices or teachings of any institution; it merely sets forth minimum standards which must be met in order for an institution to be authorized to issue degrees. Moreover, the evidence shows that the granting of degrees is a purely secular activity. It is only this activity that brings the School under the regulation of the Act.

The distinction between teaching and the granting of degrees or other educational credentials was well stated by the Supreme Court of New Jersey in *Shelton College v. State Bd. of Ed.*, 48 N.J. 501, 226 A.2d 612 (1967), in rejecting a claim that the First Amendment prohibited the state from regulating degree-granting institutions of learning. We quote approvingly therefrom the following:

"It should be noted that the resolution in question does not limit in any way what Shelton may teach. Rather the resolution concerns the power to confer the bachelor degree. Hence Shelton's thesis, logically extended, must be that everyone has the absolute power to bestow degrees evidencing higher educational achievement, no matter how remote the course of instruction may be from the values the educational degree is commonly thought to hold.

It contends that society may protect itself from the obvious evils of that proposition only by relying upon private evaluations of colleges, such as those made by the regional accreditation associations which now pass upon the standing of colleges on a voluntary basis.

"Shelton points to no authority to support its position. The history of the subject runs strongly the other way. . . .

\* \* \* \* \* \*

"And it is the degree, evidential as it is of academic attainment, which especially is an appropriate object of regulation. As stated in Elliot, The Colleges and the Courts (1936), p. 200, 'The power to confer academic degrees is to be regarded as distinct and separate from the privilege of being incorporated as an educational institution. The privilege of granting degrees is very intimately related to the public welfare, and is unquestionably subject to regulation by the State.'

"Thus the Supreme Court of Vermont refused to imply the power to confer degrees, saying in *Townshend v. Gray*, 62 Vt. 373, 19 A. 635, 636, 8 L.R.A. 112 (1890):

' \* \* \* To hold that the legislature, by a general law, intended that any three men in any town in the state, however illiterate or irresponsible, might organize and flood the state with doctors of medicine, doctors of law, doctors of divinity, masters of arts, civil engineers, and all the other various titles that everywhere in the civilized world have signified high attainments and special equipment for a professional work, is to liken it to the witty French minister who threatened to create so many dukes that there would be no honor to be one, and a burning disgrace not to be one.' " 226 A.2d at 616–618.

■ As noted by the Chancellor, no proof has been offered in this case that operation of the Clarksville School of Theology is required by religious beliefs of the defendants; but, if such were the case, the application of this Act would only prohibit the granting of degrees by them and would not interfere with the content or methods of instruction. The School can choose to not

comply with the Act and yet may continue to train ministers as it chooses; such non-compliance with the Act will simply prohibit the School from granting degrees.

■ Appellants rely upon *Catholic Bishop of Chicago v. N.L.R.B.*, 559 F.2d 1112 (7th Cir. 1977), *aff'd* on statutory grounds, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Caulfield v. Hirsch*, 410 F.Supp. 618 (1976); and *Surinach v. Pesquera de Busquets*, 604 F.2d 73 (1st Cir. 1979). We have examined these authorities and find that none of them is applicable to the case before the Court. In the *Catholic Bishop of Chicago* case it was held that the National Labor Relations Board does not have jurisdiction to hear cases involving labor disputes in parochial schools. The United States Court of Appeals reasoned that the exercise of jurisdiction by the Board could inhibit the authority of the Bishops to maintain the schools in accordance with ecclesiastical doctrine because the Board could charge unfair labor practices in the event the Bishop choose to terminate a teacher's employment because of the religious content of his or her teaching. In the *Caulfield* case it was held that the N.L.R.B. did not have jurisdiction over parochial schools, citing and relying upon the *Catholic Bishop of Chicago* case. In both of these cases, government regulations could have affected the degree of religious teaching, whereas, in the instant case the statute merely sets out minimum standards for the granting of degrees and in no way affects the degree of religious content in the classroom. In the *Surinach* case the Court of Appeals for the First Circuit prohibited the Puerto Rico Department of Consumer Affairs from subpoenaing financial information from the Catholic church respecting the operational costs of its parochial schools. The court there concluded:

"At least in this case we are dealing with the gathering of information in a context where we cannot conceive—nor have we been apprised—of any rational end product use of this information which will not encroach on appellants' First Amendment rights." 604 F.2d at 75.

The court expressed the fear that the gathering of the information sought by the government was merely "a first step" and that the Department could attempt to impose ceilings upon expenditures of the schools which would amount to excessive government entanglement with religion and interfere with the religious objective of the maintenance of excellence in Catholic schools. No such interference by the state with the financial affairs of the Clarksville School of Theology is posed in the instant case. In our view, none of these authorities supports the position of the appellants in this case.

T.C.A., § 49–3904(d), specifically exempts:

"Education offered by eleemosynary institutions, organizations, or agencies, so recognized by the commission, *provided such education is not advertised or promoted as leading toward educational credentials.*" (Emphasis added.)

The Clarksville School of Theology would qualify for this exemption if it did not offer its program as leading toward "educational credentials" which are defined by T.C.A., § 49–3903, to include "degrees" or "diplomas"; but, as long as it does offer such "credentials" the Clarksville School of Theology is subject to regulation by the Tennessee Higher Education Commission and the minimum standards for authorization set forth in Chapter 1540–1–2 of the *Official Compilation, Rules and Regulations of the State of Tennessee*.

■ It is established in the evidence that granting a degree is not a part of the Clarksville School of Theology's religious beliefs and is not considered by it to be religious activity. Indeed, the President and founder of the School testified that getting a degree was not a tenet of faith followed by the School. Nevertheless, the School contends that application of the statute to it has an indirect effect on its religious activity of educating ministers. It contends that the effect confronts it with two choices: (1) If it continues to award degrees, it would have to comply with the Tennessee Higher Education Commission

regulations which, it contends, it cannot and would not be able to do and, thus, would have to close its doors or (2) if it stopped awarding degrees, no one would desire to attend the School and, again, it would slowly cease to exist. Therefore, the School claims that the Act indirectly prohibits it from carrying on the religious activity of training ministers.

Nevertheless, the fact remains that the State is merely regulating the awarding of educational degrees. The supposed predicament of the School is not a result of the state's regulation of its religious function of *training ministers* but of its pre-eminent role of *awarding degrees* which is, as conceded by its President and founder, a purely secular activity.

The reliance of the appellants upon *Sherbert v. Verner, supra; Wisconsin v. Yoder, supra*; and *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), is misplaced. In each of these cases, the effect of the state law was to impose an indirect burden upon the right of free exercise of religion. For example, in *Sherbert* the South Carolina statute forced the citizen to choose between her right to receive unemployment benefits and her right to practice her religion by keeping Saturday as the Sabbath. Said the court:

> "The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Government imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." 374 U.S. at 404, 83 S.Ct. at 1794.

The statute here under consideration does not require any individual to violate religious convictions. The Clarksville School of Theology does not claim as a tenet of its religion that its ministers should receive academic degrees. Thus, no *Sherbert, Yoder,* or *McDaniel* type of dilemma is posed in the instant case.

We find no constitutional infirmity in the statute; the decree of the trial court is affirmed. Costs incurred on appeal are taxed against the appellants.

HARBISON, C. J., and FONES, COOPER and DROWOTA, JJ., concur.