NEW JERSEY–PHILADELPHIA PRES-
BYTERY OF the BIBLE PRESBYTE-
RIAN CHURCH; Shelton College, A
Ministry of Bible Presbyterian Church;
Bible Presbyterian Church of Collings-
wood, New Jersey; Kevin Wilson, Brad
Gsell, Kevin Clair Michael, Curtis Jor-
dan Bashaw, Louise Olson and Everette
Charles Olson, Plaintiffs,

v.

NEW JERSEY STATE BOARD OF HIGH-
ER EDUCATION; T. Edward Holland-
er, Chancellor of New Jersey Depart-
ment of Higher Education; Richard D.
Breslin, Assistant Chancellor for Aca-
demic Affairs of the New Jersey Depart-
ment of Higher Education; and Amorita
Suarez, Director of the Office for Inde-
pendent Colleges and Universities of the
New Jersey Department of Higher Edu-
cation, Defendants.

Civ. A. No. 79–3341.

United States District Court,
D. New Jersey.

Jan. 4, 1980.

William Bentley Ball, Philip J. Murren, Ball & Skelly, Harrisburg, Pa.; Keith J. Bashaw, P. A., Haddonfield, N. J.; C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for plaintiffs.

John J. Degnan, Atty. Gen. of the State of New Jersey by Robert A. Fagella, Dierdre M. Barz, Deputy Attys. Gen., Trenton, N. J., for defendants.

DEBEVOISE, District Judge.

## INTRODUCTION

Shelton College (a religious institution of higher learning), church entities affiliated with Shelton College, Shelton College students and parents, and a Shelton College faculty member seek injunctive and declaratory relief to prevent the New Jersey State Board of Higher Education from requiring Shelton College to comply with New Jersey's statutes and regulations governing the granting of degrees.

Prior to the institution of this action, the State Board of Higher Education instituted suit in the Chancery Division of the Superior Court of New Jersey seeking to enjoin Shelton College from operating until licensed by the State Board. The state court issued a temporary restraining order and then a preliminary injunction which, among other things, enjoined Shelton College and its directors and officers "from engaging in advertising, assisting in or causing the offering of any courses or classes of instruction, or engaging in any form of educational instruction . . . except for presently enrolled students until the conclusion of the academic semester on December 22, 1979, unless a license for same is issued by the New Jersey Department of Higher Education . . . ."

The action is brought under 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§ 1983 and 1985; 28 U.S.C. §§ 2201 and 2202. The matter in controversy exceeds the sum of $10,000, exclusive of interest and costs. A judgment is sought declaring that the application to Shelton College of the state licensing and approval scheme contained in N.J. S.A. 18A:3–3, 18A:3–13, 18A:3–14, 18A:68–3, 18A:68–6, 18A:68–8 and 18A:68–10 is violative of rights of all of the plaintiffs protected by the First, Ninth and Fourteenth Amendments to the Constitution of the United States.

## FINDINGS OF FACT

I find that the following facts have been established:

1. The Parties Plaintiff:

New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church is the regional ruling body of Bible Presbyterian Church, and consists of ministers and representative elders from Bible Presbyterian Church congregations within New Jersey and Pennsylvania.

Bible Presbyterian Church of Collingswood, New Jersey, is a member congregation of Bible Presbyterian Church.

Bible Presbyterian Church is a fundamentalist Christian church with a nationwide membership. It conducts educational ministries for the sole and ultimate purpose of spreading its religious beliefs. In keeping with this practice, the plaintiffs, New Jersey-Philadelphia Presbytery and Bible Presbyterian Church of Collingswood, have sponsored, as an integral part of their religious mission, plaintiff, Shelton College, a New Jersey corporation which has its campus in Cape May. The Presbytery's sponsorship has taken the form of (a) formal approval of the college, pursuant to ecclesiastical procedures, as an "agency" of the

denomination, and (b) financial support. Sponsorship by the Bible Presbyterian Church of Collingswood has taken the form of financial support.

Shelton College is an outgrowth of the National Bible Institute founded in 1907 to train "Christian Warriors". It is a small institution presently numbering only thirty students, but for several decades it has been the principal source of this denomination's seminarians who are educated for the ministry and other church missions at Faith Seminary in Pennsylvania.

Shelton College purports to award Bachelors' degrees in the Arts, Sacred Theology, Christian Education and Sacred Music. It receives no local, state or federal funds due to the beliefs of Bible Presbyterian Church respecting the separation of church and state.

Plaintiffs Wilson, Gsell, Michael and Bashaw are full-time students at Shelton College who profess to be "born again" Christians of fundamentalist Christian faith and who have elected to attend the college and wish to continue their education there by reason of their religious convictions.

Plaintiffs Everette Charles Olson and Louise Olson, his wife, are the parents of Corrine Olson, a sophomore presently a student at Shelton College, Ken Olson, a 1979 graduate of Shelton College, and Claudia, a tenth grade high school student who hopes to attend Shelton College. These parents believe that Shelton College is an institution of post-secondary education which fulfills the religious and moral goals which they desire for their children. Unlike many institutions of higher learning which are church-related but which are now virtually indistinguishable from purely secular institutions, Shelton College remains totally oriented to its religious beliefs and practices.

Plaintiff Everette Charles Olson is also a professor of mathematics and chemistry at Shelton College. He serves as a full-time faculty member at the College and is a practicing member of Bible Presbyterian Church and a "born again" Christian. He pursues his work as a religious ministry.

2. The Parties Defendant:

Defendant New Jersey State Board of Higher Education is the supervisory body of the Department of Higher Education of the State of New Jersey.

Defendant T. Edward Hollander is Chancellor of the New Jersey State Board of Higher Education and serves as its chief executive officer.

Defendant Richard D. Breslin is Assistant Chancellor for Academic Affairs of the Department of Higher Education of the State of New Jersey and is responsible for the licensing and approval of institutions of post-secondary education in the State of New Jersey.

Defendant Amorita Suarez is the Director of the Office for Independent Colleges and Universities of the Department of Higher Education of the State of New Jersey, which is responsible for processing and approving applications for licensing of institutions of higher learning for the State of New Jersey.

3. The Contested Statutes:

Shelton College does not possess a license from the State of New Jersey authorizing it to confer degrees, and in this action plaintiffs seek a judgment declaring the application of the State licensing and approval scheme as applied to Shelton College to be violative of their rights protected by the First, Ninth and Fourteenth Amendments of the United States Constitution.

The Board of Higher Education has the duty of general supervision of higher education in the State of New Jersey pursuant to N.J.S.A. 18A:3-1, et seq., and N.J.S.A. 18A:68-1, et seq.

N.J.S.A. 18A:68-3 provides that "No corporation shall furnish instruction or learning in the arts, sciences or professions for the purposes of admitting any person to the grade of a degree, or shall confer or participate in conferring a degree, giving to any person a diploma of graduation or of proficiency in a course of study, in learning, or in scientific arts or methods, within this state, until it shall have filed a certified copy of its certificate of incorporation with

the board of higher education and obtained from such board a license to carry on the business under such rules as the board of higher education may prescribe."

If an institution carries on the business of such instruction or teaching or confers any such degree without a license issued under this statute, the Board of Higher Education is authorized to bring a civil action in the Superior Court to restrain the institution from engaging in such activity until it has obtained a license or the approval of the Board of Higher Education. N.J.S.A. 18A:68–5.

If an institution or any of its officers confer or participate in conferring any degree upon a student contrary to the provisions of N.J.S.A. 18A:68–1, et seq., or sign any certificate or diploma as evidence of the conferring of a degree, the institution or such officers may be fined not more then $300 for each offense. N.J.S.A. 18A:68–9. Failure to pay this penalty will result in commitment to a county jail for a period not exceeding ninety days. 18A:68–10.[1]

### 4. Prior Litigation:

More than a decade ago Shelton College instituted an action in the State courts attacking the constitutionality of the statute relating to the granting of baccalaureate degrees, Shelton College v. State Bd. of Ed., 48 N.J. 501, 226 A.2d 612 (1967). The action was commenced by an appeal to the Appellate Division of the Superior Court from resolutions of the State Board of Education which set a cutoff date after which the College could not confer degrees. The reason for the action of the Board was that the College had not met the State's licensing requirements. The New Jersey Supreme Court certified and thereafter heard the case.

The grounds for the attack on the licensing statute were (i) it is beyond the power of the government to regulate in any way the awarding of a Bachelor's degree because of the right of free speech guaranteed in the Constitutions of the United States and New Jersey; (ii) the statute fails to set forth a sufficient standard for the exercise of the legislative power delegated to the State Board in violation of the State Constitution; (iii) the statute creates an unconstitutional classification in that it exempts colleges which had the power to confer the degree twenty-five years before the enactment of the statute; and (iv) the Board has no power to condition approval upon terms to be met and thus to subject the approval upon annual decisions as to whether it should be withdrawn for failure to meet the terms.

It should be noted that the record in that case consisted only of the notice of appeal and the two resolutions of the State Board of Education. There was nothing in the record setting forth the nature of Shelton College as a religious institution.

There are no significant differences for present purposes between the statute under review in Shelton College v. State Bd. of Ed., supra, and the statute at issue in the present case.

In the opinion in that case, written by Chief Justice Weintraub, the Court reviewed with great care the history of legislation requiring State Board licensing of degree-granting institutions of higher learning. The Court upheld the statute, ruling against the College on all of its grounds of invalidity. In view of the relief which the defendants seek in their pending action in the New Jersey courts described hereinafter, it is important to note what the Court did and did not decide in the Shelton College case. It upheld the power of the State Board to refuse to license Shelton College to grant degrees, and presumably it would have upheld action of the State designed to prevent the College from granting the kinds of degrees traditionally subject to State regulation. It did not and was not asked to forbid Shelton College from teaching.

---

1. The statutes have been implemented by detailed regulations which set forth the procedures by which a college can be licensed. N.J. A.C. 9:1–1.1, et seq. An applying institution must furnish extensive information about its administrative organization, finances, educational programs, faculty, library, students, student services and physical facilities.

A close reading of the case leads to the inescapable conclusion that the Court intended to approve regulation of the awarding of the Bachelor degree, or other recognized degrees, and nothing more. It stated, "And it is the degree, evidential as it is of academic attainment, which especially is an appropriate object of regulation." (48 N.J. at 511, 226 A.2d at 618), and it quoted Elliott, *The Colleges and the Courts* (1936), for the proposition that "The power to confer academic degrees is to be regarded as distinct and separate from the privilege of being incorporated as an educational institution." The Court stated: "It should be noted that the resolution in question does not limit in any way what Shelton may teach. Rather the resolution concerns the power to confer the bachelor degree." 48 N.J. at 509, 226 A.2d at 616.

The Court explicitly rejected Shelton College's contention that the statutory power to regulate the granting of a degree carried with it the power to destroy religious or free-speech rights being exercised by an institution of higher learning, stating: "Of course the power to regulate does not depend upon a power to destroy. If government were denied the power to regulate unless it could also prohibit, there could hardly be law and order. Our statutes abound with needful restrictions upon rights of the person and of property notwithstanding the Constitution would protect those rights from destruction. Rather the Constitution condemns such exercises of the police power as are arbitrary, and leaves it to its constituted officers to say when the boundaries of that power have been breached." At 515, 516, 226 A.2d at 620.

Thus the *Shelton College* case holds only that New Jersey may forbid a college to grant a recognized degree without State licensing. It may be fairly implied from the opinion of the court that the State has no power under the applicable statute to order an educational institution, religious or secular, to stop teaching.

### 5. Background Facts:

In 1971, after the *Shelton College* decision and the conclusion of certain other litigation involving the College (*In Re Shelton College*, 109 N.J.Super. 488, 263 A.2d 810 (App.Div.1970)), the State Board of Higher Education revoked the temporary license to confer degrees in New Jersey which it had previously awarded to Shelton College.

In about September 1971, Shelton College began operating in Cape Canaveral, Florida, as a licensed educational institution in that state.

In February of 1979, Shelton College submitted an application to the New Jersey State Board of Higher Education seeking a license once again as a degree-granting institution in this state. Authorization was sought to grant a Bachelor of Arts degree and degrees in the areas of Biblical Literature, Christian Education, Elementary Education, Secondary Education, English, History, Business Management, Music Education and Natural Science.

Defendant Amorita Suarez, Director of the Office of Independent Colleges and Universities, Department of Higher Education, started processing the Shelton College application. In an affidavit filed in the state court proceedings, she stated she informed Shelton College it must obtain a license "before it could offer any instruction which in any manner would result in the award of credits or degrees". However, a letter to the College from defendant Richard D. Breslin, Ph.D., Assistant Chancellor of Academic Affairs, Department of Higher Education, stated that: "no educational activities may take place in New Jersey prior to Board approval."

Thus whether or not Shelton intended to grant degrees, a State official forbade it to teach anything for any purpose unless it had Board approval.

In July 1979, Ms. Suarez learned that Shelton College intended to offer courses of instruction in New Jersey in the fall of 1979 and grant degrees to students through its Florida affiliate. In the summer or fall of

1979, Shelton College in fact commenced a teaching program in New Jersey.

On October 19, 1979, Ms. Suarez went to Shelton College's facilities at Cape May, New Jersey, and was met with the following sight: "young people walking about the facility carrying books, and studying in the library". [Suarez affidavit, paragraph 10.]

On the basis of this frightening observation, she informed the College's president that the College was operating in violation of New Jersey law. She was unable to ascertain from Shelton College officials whether it intended to grant credits for degrees either in New Jersey or Florida, but she did ascertain from a Florida official that the College had requested permission to grant credits and degrees in Florida for instruction offered in New Jersey.

It was the State Board's position that "no aspect of the educational process may take place at Shelton College in New Jersey until the license application is fully evaluated and approved". [State Board's Complaint in the State Court action, paragraph 13.]

Alerted to Shelton College's teaching activities and acting pursuant to N.J.S.A. 18A:68–5, the State Board instituted proceedings in the Chancery Division of the Superior Court of New Jersey. The relief sought included judgment "enjoining and restraining all defendants and their employees, servants and agents from engaging in, assisting in or causing the offering of any courses or classes of instruction, or engaging in any form of educational instruction, or offering or providing any credits, awards, certificates or degrees for any such instruction or educational experience which has been given to any enrolled student or other individual since September 1, 1979 in or about the property of Shelton College in Cape May, New Jersey, until a license for same is issued by the New Jersey Department of Higher Education".

The complaint was filed on November 15, 1979. A temporary restraining order was entered by the Court which enjoined all educational or instructional activities of Shelton College. Excepted from the order was instruction for students then attending the College until the end of the academic semester on December 22, 1979.

On November 19, 1979, plaintiffs commenced the instant action in the Federal Court and sought a temporary restraining order enjoining application of the State licensing statutes to Shelton College and staying the State Court proceedings. This Court declined to issue the temporary restraints and stay, but set the matter down for a prompt hearing on plaintiffs' application for a preliminary injunction.

In the meantime, the State Court issued a preliminary injunction which in effect continued the total prohibition against "advertising, assisting in or causing the offering of any course or classes of instruction or engaging in any form of educational instruction except until December 22, 1979, with respect to currently enrolled students unless a license for same is issued by the New Jersey Department of Higher Education". Shelton College was also ordered to "cause every student presently enrolled in Shelton College to be notified of the terms of the order".

Prior to the Federal Court hearing on plaintiffs' application for a preliminary injunction, defendants moved to dismiss all claims and allegations contained in the complaint on the grounds that (i) the complaint failed to state a claim upon which relief can be granted, and (ii) plaintiffs are barred by the doctrines of abstention, ripeness, *res judicata* and collateral estoppel. A hearing was held on plaintiffs' application and on defendants' motion.

At the hearing plaintiffs called as witnesses students attending Shelton College, parents of Shelton College students and faculty members. It also called various church officials. Most of these people were members of the Bible Presbyterian Church. Some were members of other conservative Protestant denominations, such as the Independent Baptist Church or Mennonite Church. Although these churches may differ in ceremonial practices and forms of church government, they all share the same

central theological beliefs and codes of personal conduct.

Central to their beliefs is their conviction that the Bible is the infallible, inerrant Word of God which provides guidance for every phase of life. They believe in the fallen nature of man, that by reason of his sinful nature man cannot (as the "humanist" would contend) achieve his own Utopia or salvation, that man can be saved only by the substitutionary sacrifice of Jesus and the acceptance of that sacrifice by the believer.

For these persons there are no areas of life which are not governed by their Biblical faith, whether it be their personal conduct, their vocations or the subjects they teach. Both the students and the teachers who testified believe that their presence at Shelton College is for the purpose of preparing themselves or others to perform the missions their Lord calls upon them to perform.

Several of these students could have attended recognized secular colleges and universities had they chosen to do so. The teachers work at Shelton College at considerable financial sacrifice to themselves.

When students attend Shelton College, they accept a strict code of conduct embodied in their Student Handbook (Exhibit P-1). This includes dress codes, compulsory chapel four days a week, refraining from studying, swimming, sun-bathing and athletics on Sundays, refraining from the possession or use of alcoholic beverages, tobacco, non-medicinal narcotics or hallucinogenic drugs and marijuana, and avoiding modern dance, commercial movies and rock and roll music. There is strict regulation of dating, engagements and marriage.

Every academic subject is taught from a perspective of the religious point of view of the fundamentalist denominations, whether it be history, art, economics, chemistry or English literature. The conduct and beliefs of the Shelton student and the theological doctrines which form the content of the academic program are at total variance from secular and most church-sponsored colleges and universities. This is the reason why the students have selected Shelton College, why the parents wish their students to attend, and why the faculty members teach there. They seek the nurture and fellowship of a community of the faithful, where they can develop their understanding and knowledge of their own faith, and where they can prepare to propagate it in the world at large.

The order secured by the State Board of Higher Education requires that on December 22, 1979, Shelton College, the core of this community of believers, must cease teaching. By state fiat a religious community will be destroyed.

Plaintiffs seek the aid of the Federal Court to protect their religious and other constitutional rights.

### Conclusions of Law

These proceedings present the following legal issues:

(i) May the New Jersey State Board of Higher Education order a church-oriented college, which has not obtained a State degree-granting license, to cease advertising and to halt all teaching activities?

(ii) If it is concluded that the State Board may not issue or obtain such an order, may it issue an order forbidding a church-oriented college from granting one of the recognized forms of degrees until it is licensed in the manner required by the State, notwithstanding the fact that administration of the licensing statutes and regulations will require the State to involve itself to an as yet undetermined extent in the affairs of the college?

(iii) If it is concluded that the State Board may require a church-oriented, New Jersey college to be licensed under State law before it may grant one of the recognized degrees, may the Board lawfully, under the United States Constitution and the applicable New Jersey statutes, forbid that college to award degrees pursuant to licensing procedures of another state?

(iv) Finally, accepting that the Court has undoubted jurisdiction of this case under 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343,

and 28 U.S.C. §§ 2201 and 2202, should the Court hear the matter in light of the fact that prior to the commencement of this action the State Board of Higher Education instituted a proceeding in the State Courts in which the same issues can be raised?

### 1. Whether the Court should hear the case:

■ If under prevailing law the Court should decline to hear this case, there would be no need to address the first three legal issues, and, therefore, the Court's authority to hear the case will be considered first.

The defendants advance two preliminary reasons why the complaint should be dismissed without consideration on the merits. They argue that the injuries alleged by plaintiffs are purely hypothetical and do not present a case or controversy, requiring dismissal of the complaint under the principles set forth in *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). They also argue that the same issues which plaintiffs raise in this case were raised or could have been raised in *Shelton College v. State Bd. of Ed., supra*, and that, therefore, plaintiffs are barred from relitigating them in the present action.

Neither point is well-taken. As far as each plaintiff is concerned, the constitutional issues presented are not abstractions. They have immediate, concrete impact upon them. There is nothing hypothetical about the fact that if defendants' actions stand: (i) the church entities will lose a college which they have sponsored; (ii) the college itself will be closed, perhaps forever, and effectively prevented from teaching its doctrines and its version of the liberal arts and natural sciences; (iii) the student plaintiffs will be unable to attend an institution, the teachings of which are in accord with their beliefs and which constitutes a community of believers whose ways of life are different from those of students attending secular colleges; (iv) the parent plaintiffs will no longer have available a college at which their children can be educated in an environment which is compatible with their religious beliefs; and (v) the teacher plaintiff will lose the institution at which he can teach in accordance with his faith.

For these people the threat is far from speculative. If the preliminary injunction issued by the State Court stands, on December 22, 1979, all of those events will take place, and all of those injuries will have been incurred.

■ As for the defendants' *res judicata* and collateral estoppel contentions, while it is clear that even in a § 1983 Civil Rights case the doctrines may bar relitigation in a Federal Court of issues already decided in a State Court, *Roy v. Jones*, 484 F.2d 96 (3d Cir. 1973), these doctrines do not affect the present case.

In the first place, in the *Shelton College* case, the New Jersey Supreme Court did not have occasion to address the first and third legal issues recited above, namely, whether the State Board can compel Shelton College to stop teaching and advertising and whether Shelton College can grant degrees under a Florida license. They simply were not issues in that case. In fact, a fair reading of the 1976 case compels the conclusion that the New Jersey Supreme Court was of a view that the State Board's power was limited to licensing or not licensing a college to grant degrees, and that the Board does not have the power to order any institution to stop teaching, an order which would offend every constitutional concept of free speech. The 1967 case involved very different facts and very different claims.

Further, the plaintiffs in the 1967 New Jersey case and in the present case are different. Only Shelton College was a plaintiff in the earlier matter. In the matter at hand, there are also church bodies, students, parents and a teacher, each asserting important constitutional rights of which they cannot be deprived by reason of a ruling in a case to which they were not parties and in which they had no opportunity to be heard. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see New Jersey Ed. Ass'n. v. Burke*, 579 F.2d 764, 774 (3d Cir. 1978), *cert. denied*, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978).

Thus plaintiffs are not barred in this proceeding by the doctrines of *res judicata* and collateral estoppel.

■ The State Board also urges that this action should be dismissed as a matter of comity and in recognition of principles of federalism since there is a pending State Court proceeding started before this action was commenced in which the issues raised here can be resolved. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The State Board further urges that this matter should be dismissed or at least held in abeyance because a constitutional issue may depend upon a State court's interpretation of the licensing statutes and thus the State courts should resolve those interpretive questions before this Court acts. *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

In arguing this position, the State Board has presented a contrived description of what this case is all about. It proceeds on the assumption that the only substantive issue before the Court is legal question No. 2 set forth above: Whether the State Board may forbid a church-oriented college from granting a degree. For example, the State Board brief defines the situation as follows:

It must be kept in mind that the degree-granting privilege is the only basis for the State's exercise of any authority over the college. *See* NJSA 18A:68–3; NJSA 18A:68–6. The Board of Higher Education does not contend that it may prevent Shelton College, or any other religious institution, from disseminating its religious beliefs or from educating its younger generation. It is only when that educational process results in the granting of a degree in which the State can legitimately assert genuine secular concerns that the responsibility of the State to protect the public interest is invoked. (P. 5.)

Of course, this is not the situation presented to this Court. The State Board not only seeks to forbid the granting of degrees, it seeks to stop all teaching at Shelton College and to prevent the College from informing its co-religionists and others about the existence and purposes of the College. Already the College has been forbidden to advertise itself, an appalling infringement of free speech, and, unless the Court acts, on December 22, 1979 the College, its teachers and its church sponsors will be forbidden to teach, an appalling infringement of the rights of free speech and the free exercise of religion.

I have concluded that this case in part is within the exceptions to the *Younger* and *Pullman* doctrines. However, an analysis of defendants' position, assuming their portrayal of the case were accurate, would be useful in explaining the relief which will be ordered at the conclusion of this proceeding. If one were to accept the State Board's contention that all that is involved in this case is a question whether the State Board has the power to license Shelton to grant degrees and if there were no attempt to shut down this teaching institution, it is my opinion that both the *Younger* and the *Pullman* doctrines would be applicable.

It is the plaintiffs' fundamental position in this case that Shelton College, a religious institution, cannot be made subject to the degree licensing requirements of the New Jersey statutes and regulations. They argue, with some persuasiveness, that implementation of those statutes and regulations involve the State so extensively in religious matters that the First and Fourteenth Amendments' free speech and free exercise of religion rights are unconstitutionally impaired, citing such cases as *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977), *aff'd*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 660, 87 L.Ed. 1125 (1943); *Grace Brethren Church, et al. v. State of California, et al.,* (Sept. 21, 1979); *Caulfield v. Hirsch,* 95 L.R.R.M. 3164 (E.D.Pa.Civ. No. 76–279, 1977).

Plaintiffs thus seek protection in the Federal Courts of rights asserted under the United States Constitution, as they are entitled to do under § 1983. When a plaintiff

asserts rights under that statutory provision, a court is not barred by 28 U.S.C. § 2283 from enjoining state court proceedings if such an injunction is necessary to secure such rights. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). However, even though a Federal Court is not deprived of jurisdiction to issue an injunction in such a case, it is still required to consider "the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding". 407 U.S. at 243, 92 S.Ct. at 2162.

The State Board in the present case instituted its proceedings in the State Courts before plaintiffs came into this Court. The constitutional questions which plaintiffs raise here can be raised in the State Court. Although *Younger* counsels Federal Court abstention when there is a pending state *criminal* proceeding, the line of cases which has followed *Younger* compels the conclusion that a Federal Court must also abstain when there is pending a state *civil* proceeding in which the state has an important interest. This line of cases is traced in detail in the most recent of such Supreme Court cases, *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

That being the state of the law, if the State Board were doing no more than simply suing in the State Courts to prevent Shelton College from granting degrees until it qualifies for a license, this Court should abstain on the authority of *Younger* and its progeny, *e. g., State of N. J. v. Chesimard*, 555 F.2d 63 (3d Cir. 1977).

Turning to the *Pullman* doctrine, in the normal case, a Federal Court should refrain from deciding Federal constitutional issues until related state court issues have first been adjudicated in the state courts. Again, if the State Board were doing nothing more than seeking to prevent Shelton College from granting degrees, the criteria which the Court of Appeals for the Third Circuit has held bring the *Pullman* doctrine into play would exist. *D'Iorio v. County of Delaware*, 592 F.2d 681 (3d Cir. 1979).

First, there are uncertain issues of State law underlying the Federal constitutional claims brought by Shelton College. At this point it is impossible to predict how the New Jersey Supreme Court, the ultimate arbiter of New Jersey law, will interpret the statutes and regulations governing the licensing of colleges when applied to a religious institution such as Shelton College.

Second, these State law issues could be resolved in a manner that would obviate the need to adjudicate the constitutional claims. After all, Shelton College functioned without difficulty for a number of years when it was licensed under almost identical statutes to grant degrees in New Jersey.

Third, an erroneous decision by this Court of State law might well be disruptive of New Jersey's policies which are implemented by licensing institutions of higher learning.

The fact of the matter is, however, that the State Board is not simply seeking to deny Shelton College the right to grant degrees. It is seeking as of December 22, 1979, to prevent Shelton College from engaging in any teaching activities whatsoever. It is seeking to force the disbanding of a community of religious believers who have assembled to teach and study in accordance with their faith and conduct their lives as required by that faith. This places the situation within an exception to the *Younger* doctrine and it requires a Federal Court to decline to invoke the *Pullman* doctrine upon equitable principles.

The United States Supreme Court has consistently recognized that the *Younger* doctrine of abstention will not be applied in extraordinary circumstances where there will be great, immediate and irreparable harm if the Federal Court does not intervene. *Moore v. Sims, supra; Kugler v. Helfant*, 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

In the case of the *Pullman* doctrine, once it is determined that the case is within the general ambit of the doctrine, a weighing process must take place to determine if the

doctrine should be applied. *Frederick L. v. Thomas,* 578 F.2d 513, 517 (3d Cir. 1978). As will be discussed below, the rights which the proposed action of the State Board would destroy are so important and the threatened injury to those rights so irretrievable, the *Younger* and *Pullman* doctrines must give way.

2. The Power of the State Board to Prohibit Shelton College to Teach:

█ We now turn to the first question of law set forth earlier, whether the State Board may compel Shelton College to cease advertising and teaching.

Highest in the pantheon of civil rights guaranteed by the United States Constitution are the right to be free of laws prohibiting the free exercise of religion or abridging freedom of speech. The degree of protection to which these rights are entitled was spelled out in detail in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

There, in violation of Wisconsin's compulsory school attendance laws, which required a child's school attendance until age 16, members of the Conservative Amish Mennonite Church withdrew their children from public schools at age 14 and educated them in accordance with their beliefs and practices. Notwithstanding the substantial State interest in the secondary education of its children, the United States Supreme Court held that application of the law to that religious sect violated the sect's rights under the Free Exercise Clause of the First Amendment made applicable to the State by the Fourteenth Amendment.

The State of New Jersey has far less interest in regulating the colleges attended by young persons who have passed the age of compulsory school attendance. The following quotations from *Yoder,* therefore, apply with even greater force to Shelton College and the actions which the State Board seeks to take.

Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility was, in *Pierce,* made to yield to the right of parents to provide an equivalent educa-

tion in a privately operated system. There the Court held that Oregon's statute compelling attendance in a public school from age eight to age 16 unreasonably interfered with the interest of parents in directing the rearing of their offspring, including their education in church-operated schools. As that case suggests, the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society. [Citations omitted.] Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce,* 'prepare [them] for additional obligations'. At 213, 92 S.Ct. at 1532.

. . . we see that the record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. That the Old Order Amish daily life and religious practice stem from their faith is shown by the fact that it is in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, 'be not conformed to this world . . . .' This command is fundamental to the Amish faith. Moreover, for the Old Order Amish, religion is not simply a matter of theocratic belief. As the expert witnesses explained, the Old Order Amish religion pervades and determines virtually their entire way of life, regulating it with the detail of the Talmudic diet through the strictly enforced rules of the church community. At 216, 92 S.Ct. at 1533.

Wisconsin concedes that under the Religion Clauses religious beliefs are abso-

lutely free from the State's control, but it argues that 'actions' even though religiously grounded, are outside the protection of the First Amendment. But our decisions have rejected the idea that religiously grounded conduct is always outside the protection of the Free Exercise Clause. At 219, 220, 92 S.Ct. at 1535.

We turn, then, to the State's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way. Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption. At 221, 92 S.Ct. at 1536.

We must not forget that in the Middle Ages important values of the civilization of the Western World were preserved by members of religious orders who isolated themselves from all worldly influences against great obstacles. There can be no assumption that today's majority is 'right' and the Amish and others like them are 'wrong'. A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different. At 223, 92 S.Ct. at 1537.

In the present case, the State of New Jersey has no interest comparable to that of Wisconsin in the *Yoder* case. Its interest as defined in the 1967 *Shelton College* case is to protect "the integrity and value of the bachelor degree", 48 N.J. at 517, 226 A.2d at 621, an interest which can surely be protected without trampling upon and extinguishing the rights of free speech and free exercise of religion.

Surely neither *Younger* nor *Pullman* nor their descendants prevent a Federal Court from acting pursuant to its unquestioned § 1983 powers to prevent such acts by a State Court.

### 3. The Relief to be Granted:

I conclude that plaintiffs have every likelihood of prevailing on the merits insofar as the State Board seeks to close Shelton College by forbidding it to advertise and teach, that all of the plaintiffs are threatened with immediate and irreparable injury to their rights of free speech and right to freely exercise their religion, that none of the other parties to this action are prejudiced in any way by Shelton College's continued operation, and that all members of the public at large will ultimately benefit if the constitutional rights of a small religious minority are protected from encroachments by honorable but overly zealous public officials. Preliminary injunctive relief is appropriate.

An order will be entered enjoining defendants from taking or permitting the taking of any action having the effect or designed to have the effect or preventing Shelton College or any of its employees, servants and agents from engaging in any religious, teaching or educational activities or from publicizing or advertising such activities.

Provided that no action is taken in the pending State Court proceeding which would in any way curtail plaintiffs' rights as defined in the order mentioned above, there will be no need to enjoin the prosecution of that proceeding. It is presumed that the outstanding preliminary injunction in the State action will be modified appropriately to reflect the mandate of the preliminary injunction entered in this case. If so, that action may proceed to a determination of the State Board's power or lack of power to grant or deny Shelton College the right to award recognized academic degrees, and plaintiffs will have the opportunity there to raise all the constitutional contentions involved in the second and third legal issues set forth above.

Upon the granting by this Court of preliminary injunctive relief which will prevent the immediate irreparable violation of plaintiffs' constitutional rights, it will then be appropriate to apply the *Younger* and

*Pullman* doctrines. So long as there is no interference with Shelton College's religious, teaching or educational programs, this Court should abstain from deciding the remaining constitutional issues and permit them to be resolved in the first instance in the pending State Court action. This Court will retain jurisdiction pending completion of the State Court proceedings in the event further interim relief should be required.

Defendants' motion to dismiss is denied, and plaintiffs are requested to submit an order in accordance with this opinion and the applicable Court Rules.